UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ASHON OLIVE-GOFFNER,<br><br>Petitioner,<br><br>v.<br><br>HUNTER ANGLEA, Warden, [1]<br><br>Respondent. | Case No. 19-cv-01222-HSG (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the *pro se* petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Petitioner Ashon Olive-Goffner challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, Dkt. No. 29 ("Answer"), and Petitioner has filed a traverse, Dkt. No. 32 ("Traverse"). For the reasons set forth below, the petition is denied.

## I.   PROCEDURAL HISTORY

### A.   Conviction and Sentencing

On April 28, 2015, the Alameda County District Attorney filed a criminal complaint charging Petitioner with corporal injury to a relationship partner, sexual penetration by a foreign object, forcible rape, second-degree robbery, and false imprisonment by violence. *See* Dkt. No. 29-3 ("Clerk's Transcript") at 1-3. The criminal complaint also stated that Petitioner had at least two prior felony convictions, for forgery and second-degree commercial burglary. *See id.* at 3.

On August 26, 2015, a jury found Petitioner guilty of corporal injury to a relationship partner, sexual penetration by a foreign object, forcible rape, second degree robbery, and false

---

[1] Hunter Anglea, the current warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

United States District Court
Northern District of California

1    imprisonment by violence, and found true allegations that petitioner committed multiple sex

2    offenses against the same victim. *See id*. at 246-47. The trial court dismissed prior conviction

3    allegations. *See id*. at 247.

4         On September 24, 2015, Petitioner was sentenced to twenty-two years and eight months in

5    prison. *See id*. at 251.

6         **B.    Post-Conviction Appeals and Collateral Attacks**

7         On December 30, 2016, Petitioner timely sought review in the California Court of Appeal.

8    *See* Ans., Ex. 4. On November 16, 2017, in an unpublished opinion, the California Court of

9    Appeal affirmed the trial court's judgment. *See* Ans., Ex. 7.

10        On December 26, 2017, Petitioner filed a petition for review in the California Supreme

11   Court, seeking review of the state appellate court's denial of his appeal. *See* Ans., Ex. 8. On

12   February 21, 2018, the California Supreme Court summarily denied review of the state appellate

13   court decision. *See* Ans., Ex. 9.

14        **C.    Federal Court Proceedings**

15        On March 6, 2019, Petitioner filed the instant federal habeas petition. Dkt. No. 1

16   ("Petition"). On April 30, 2019, the Court found that Petitioner had stated four cognizable claims:

17        (1) the trial court erred in admitting evidence of Petitioner's interactions with a roommate

18   ("Summers") to show intent and motive;

19        (2) the trial court erred in permitting Petitioner's former girlfriend ("A.") to testify under

20   section 1109 of the California Evidence Code;

21        (3) the Court erred in refusing to permit Petitioner to present evidence of his restraining

22   order against A. to impeach her; and

23        (4) cumulative error.

24   *See* Pet.; *see also* Dkt. No. 11 ("Order to Show Cause") at 2. Petitioner filed a second petition, but

25   subsequently stated that he intended the first-filed Petition to be the operative petition in this

26   action. *See* Dkt. Nos. 14, 20. Accordingly, the Court found that the Petition filed on March 6, 2019

27   remains the operative petition, and Petitioner raises only the four claims identified in the Order to

28   Show Cause. *See* Dkt. No. 21.

1    Respondent filed an Answer on January 23, 2020. *See* Dkt. No. 29 ("Answer"). In the

2  Answer, Respondent conceded that the Petition was timely filed, and that Petitioner's claims were

3  exhausted. *See id*. at 2.

4    Petitioner filed a Traverse on March 15, 2020. *See* Dkt. No. 32 ("Traverse").

5  **II.    STATEMENT OF FACTS**

6    The following factual background is taken from the November 16, 2017 opinion of the

7  California Court of Appeal:[2]

8    ***Prior Acts of Domestic Violence Between Defendant and M.***
   At the time of trial, 22–year-old M. had known defendant for six

9  months. Defendant was 37. They met in October 2014 while working
   at a restaurant in Oakland, and began dating in November 2014. From

10 the beginning of the relationship M. believed they had good and bad
   times. Defendant told her that in order to be in a relationship with him,

11 they needed to live together. In January 2015 they began sharing a
   home in the Havenscourt area of Oakland with two housemates. M.

12 lived there until April 25.

13   Since defendant was often unemployed and she worked full-time as a
   waitress, M. financed their life. She paid the rent, bought the

14 groceries, paid when they went out, and helped him when he needed
   something. He would use her car whenever he wanted and sometimes

15 took money from her purse. M. did not like that and she told him so.
   He would try to make her feel guilty, saying she should be more

16 supportive.

17   As a boyfriend, defendant was "controlling" and "very abusive." He
   took her cell phone and used it to send text or Facebook messages,

18 and to answer messages as if he were M. He dropped her off at work
   and picked her up, in her car, so that he knew where she was all the

19 time. If she was talking to someone else in a social setting, male or
   female, he would insert himself in the conversation, sometimes

20 confrontationally. He was easily angered and anything could set him
   off. At least once a week he would threaten to kidnap and torture her,

21 break her bones, wreck her car, and burn her clothes. His threats
   scared her.

22

23   Two months into their relationship, defendant became physically
   abusive to her. The first time, he slapped her in the face so hard it left

24 a mark. He also bruised her arms and gave her black eyes. Her friends
   and family noticed the evidence of abuse but she did not talk to them

25

26 ──────────────
   [2] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*,
   853 F.3d 1049, 1055 (9th Cir. 2017). Based on its independent review, the Court finds that it can

27 reasonably conclude that the state appellate court's summary of facts is supported by the record
   and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366

28 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d
   984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

about it because she was embarrassed, she loved defendant and was not sure if at that moment leaving him was the best thing for her to do, and she thought things could get better. "I had no idea it was just going to go, you know, all the way downhill."

Another incident occurred after having a few drinks with friends in San Francisco. Defendant became so intoxicated she "had to pick him up from laying face first in the hallway by the restrooms." She decided she did not want to spend the night with him and drove to the garage of her mother's apartment building in Oakland, where she told him to get out and find his own way home because she was sleepy and did not want to be with him right then. Defendant threatened her and would not get out of the car; in frustration, M. threw a can of soda at him, hitting him in the jaw. M. was standing outside of the car. Defendant got out of the car and with both hands lifted her off the ground by her neck and held her against a wall for 45 seconds or so. When he finally let her go, M. was gasping for air. He left fingerprints on her neck. The night ended with defendant taking her car keys and leaving in her car while M. stayed with her mother. She did not report the incident to police because he was very intoxicated and she did throw something at him. In total, defendant slapped her in the face four or five times between January and April. He was not always intoxicated when he hit her.

M. and defendant separated and got back together at least three times between January and April. In March of 2015, M. left defendant for one day. That night A., defendant's former girlfriend, moved into the room M. had shared with defendant. M. was overwhelmed and spent the night in her car across the street, hoping she would snap out of it and make the decision to leave defendant. Instead, she came back to the house and with a roommate named Summers wrote "Enjoy" in lipstick on a mirror in the bedroom she shared with defendant. She also flipped over the mattress. Summers sprayed glitter hairspray on the mirror.

After they reconciled, M. told defendant that she and Summers had marked up the mirror together. Defendant was not upset with M., but he was upset that Summers had joined with her to do it and was giving her advice. From their bedroom, M. heard defendant and Summers talking in Summers's room, but it escalated very quickly, with Summers screaming "get out of my room" and "leave me alone." M. went into Summers's room to try to stop whatever was going on. Defendant and Summers were standing on Summers's bed. Summers's back was to the wall, and with two fingers, defendant pushed Summers's forehead "really, really hard" so that the back of Summers's head hit the wall. The altercation ended when M. was able to calm defendant.

By April, M. was really unhappy and had decided she was going to leave defendant soon and told him so. Defendant's reactions varied: one day he would ask her not to leave, another day he would say he could not wait for her to leave. She did not leave immediately because she had nowhere else to sleep except on her mother's couch, she had paid her rent, and she was looking for another place to live.

4

### *The Charged Offenses*

On April 24, 2015, defendant dropped M. off at work at 4:30 p.m. and picked M. up after work at 1:15 a.m. They were not getting along that day. M. was happy that night because she received a $60 tip. She decided to celebrate a coworker's birthday at a nearby bar. Defendant went with her. M. had one drink and was having a good time with her friends at one end of the bar while defendant drank by himself at the other end. Defendant drove them home. He was really upset that M. had not spent time with him at the party. Referring to M. having fun that night with her friends, defendant remarked, "You're never going to laugh like that again."

When they got home, M. took the tip money out of her purse and hid it from defendant in a shoe rack because, based on her past experience with him, she was afraid he would take it. Then she went to take a shower.

Defendant came into the bathroom and shouted at her that if she was going to leave she needed to pack her things and go now. M. was "so willing to cooperate" she got out of the shower and started pulling her things out of the closet and putting them on the bed. Meanwhile, defendant was putting her things back in the closet. Defendant called her names and threatened her, telling her she would never leave, and if she did, it would be when he wanted. He also told her, "I'll let you put on underwear, but, you know, that's all you get." As she would try to put on clothes, he would pull them off her. Defendant pushed her against a wall and "strangled" her: he put both hands around her neck and pulled her up off her feet for a longer period of time than he had the first time. After he let go of her, she thought, "Is my life going to end today?" Defendant told her he had a plan to kidnap her for two days and torture her; he referred to himself as the devil. M. was terrified and pleaded with him to stop.

At one point, defendant said, "Give me all your money, bitch." She did not want to do that so she told him it was in the trunk of her car. Defendant went out to the car and came back into the house. He dragged her outside in her underwear. She called for Summers or someone to help her as she was led outside.

Summers's boyfriend was sleeping in Summers's room and heard the sounds of struggling, yelling, and crying. He heard M. call out, "[H]elp me. Someone," and bang on the door. Defendant said, "No one's going to help you." The boyfriend did not open the door because he was scared he, too, would be hit.

Outside, defendant showed M. the empty trunk and slapped her for lying to him. The slap made her face swell and left a mark that did not go away for weeks. She considered fleeing at that point, but it was raining, there was no one out on the street, she was only wearing underwear, her breasts were exposed, and she had no shoes on, so she decided to go back inside the house.

M. apologized to defendant for lying to him and told him the money was in the room. He remained "over the moon upset," so she gave him the money. "I wanted to go. Um, I was kept in that room. There was no way for me to leave." She was "laying on the bed crying," and

defendant told her, "You're not going to get out of here.... [¶] My probation officer is not going to find out about this. The police are not going to get involved. I'm in control here."

While M. was on the bed crying, defendant sat in a chair watching her. He said he loved her tears, it made him feel good. Then he came over to the bed and started kissing parts of her body, including her breast. She would push him off or move his face, but he "would just come right back," responding with more force. He inserted his fingers into her vagina and pushed her legs open while she tried to close them. "He uses his body to keep my body open and, um, accessible to him, and he forces the act." She felt a lot of pressure on her inner thighs and upper arms. The bruises on her thighs lasted three weeks. After a minute or so defendant removed his fingers from her vagina and immediately inserted his penis. At that point, M. stopped fighting and started thinking that since he was not wearing a condom, if he ejaculated inside her she would have an excuse to go to the bathroom and possibly leave the house.

After defendant ejaculated, he lay motionless on the bed. M. wiped herself on a towel and then gained his permission to go to the bathroom to clean up. M. grabbed her pants and a shirt and ran out the door.

M. hid under a neighbor's car. After about a minute, she heard her car start up and saw defendant driving away. M. put on her clothes and ran to the nearest police station. Before she got to the police station, she saw police officers at the scene of a traffic accident on the street and asked one of them to help her. She said her boyfriend had attacked her and stolen her car. At first, she did not say she had been raped because she was so embarrassed and in shock.

She told the officer who took her to the hospital that she had been raped. She spent three or four hours at the hospital while she underwent tests of her private area and filled out another police report. She went downtown with the officers to fill out another report. After that, she went back to Havenscourt to get her car, which was parked near the house, and finally went to her mother's place.

The first police officer with whom M. made contact was Oakland Police Officer Deborah Mack. M. was out of breath and crying. She was barefoot and her left eye was swollen and bruised. She was shaking as she reported that her boyfriend had beaten her up and stolen her belongings. Officer Mack arranged for Officer Luis Roman to take a report from M. He also noted M.'s face was swollen, she was barefoot, and wore hardly any clothes. M. told Officer Roman that her boyfriend had raped her. She also said he had strangled her, stolen her tip money, and trapped her in the bedroom. She had hidden under a car before he left the house. Officer Roman transported M. to Highland Hospital.

At Highland, nurse practitioner Moser, a Sexual Assault Response Team (SART) expert, examined M. M. told Moser her boyfriend threatened to torture her for two days, hit her in the head and strangled her, licked her body and kissed her breast, grabbed her and held her upper arms, pried open her legs, inserted first his fingers and then his

6

penis into her vagina, and ejaculated inside her. Moser noted bruising and tenderness under M.'s left eye, an abrasion on the left side of her forehead, bruising on M.'s inner thighs, and four distinct areas of redness and tenderness on her inner thighs. Moser did not observe any redness, tearing, or bleeding in M.'s vagina. However, the absence of injury is not inconsistent with rape. Statistically, rape by a romantic partner leaves fewer injuries. Also, if the victim has been threatened during the rape, she may be more compliant with the sex act and thereby incur fewer injuries. Moser concluded the SART exam was consistent with M.'s version of events.

Officers Mack and Michael Fox went to the Havenscourt residence, knocked loudly on the door and bedroom window, and said, "Open the front door." Summers's boyfriend heard the knocking and woke Summers. Summers opened the door, and the police asked if defendant was home. Summers knocked on defendant's bedroom door and said the police wanted to speak to him. Defendant came to the front door and was arrested without incident.

Since that night, M. has had no contact with defendant, defendant's former girlfriend A., or Summers. However, defendant tried to contact her several times. He wrote a letter, left voicemail messages, and gave her phone number to cellmates, their girlfriends, and other strangers, who left phone or text messages. A court order prohibited him from contacting her.

### Prior Incidents of Violence with Others
#### Summers, the Housemate
Summers moved into the Havenscourt house in February 2015. He knew both M. and defendant from work; he considered M. a friend, defendant an acquaintance. At the house, he would not usually see M. by herself; she and defendant were always together. After a while, he began to think defendant had a possessive nature because defendant and M. were always in the same room together; if she went to a different room, defendant would follow her.

Summers recalled three instances when he heard M. and defendant arguing; he heard M. say "stop" or "knock it off" and then M. would leave the house to cry on the porch under his bedroom window. At some point, Summers formed the impression there was physical violence between M. and defendant, although he never saw bruising on M. and never saw them in a physical altercation. He talked to M. about it twice. He did not talk to defendant about it. When Summers moved into the house, defendant expressed discomfort with the fact that Summers was gay. Summers stayed out of defendant's way when they were in the house together.

One morning, Summers knocked on the bedroom door to talk to M. and a different woman answered the door. Defendant said he had kicked M. out of the house and he was back with the love of his life, A. He had packed up M.'s belongings and put them by the front door. Defendant asked Summers to tell M. to leave the key when she came to pick up her things. A. stayed for about a week.

M. returned to the house the next day, and expressed confusion about what was happening. Summers explained that A. was staying in the

room with defendant and advised her to leave defendant. M. was furious. Summers suggested she write on the mirror. M. wrote "Enjoy" and drew a heart in lipstick on the mirror, and then left in her car. Several days later, M. returned and reconciled with defendant. Defendant asked Summers if he had said anything to M. about A. Summers lied and said no. Defendant stood really close to Summers, which Summers found intimidating. He was scared to tell defendant the truth.

A few days later, Summers received multiple text messages and phone calls from defendant, who was in his own room, telling Summers that defendant knew he told M. about A. and defendant was going to "beat me up and do something about it." Summers felt very threatened. Defendant came to Summers's room. While Summers stood on his mattress, defendant put one hand around Summers's neck and told Summers "to stay out of his business and if it ever happened again that there would be more problems." Defendant held Summers strongly enough for Summers to feel it but not strongly enough to close off his airway. Summers's head hit the wall when defendant grabbed his neck.

The next day, defendant threatened to have his girl cousins "come over and beat me up." Summers called his own female friend for protection. Defendant's cousins never showed up, but defendant, who was drinking tequila from a coffee mug, tried to get around Summers's friend, who was standing between defendant and Summers, to get at Summers. When Summers tried to go to his room, defendant threw the liquid contents of the mug in his face. After these events, Summers rarely stayed in the house because he was in fear of his life from defendant. He also felt M. had thrown him "under the bus" by making defendant think he had written on the mirror, when in fact it had been M.

On April 25, Summers spent the night at the house with his boyfriend. He slept very deeply and did not hear anything. In the morning, his boyfriend shook him awake while the police were pounding on the window with a flashlight and yelling to open up. He opened the front door to the police and then went to check if defendant was home. He knocked on defendant's bedroom door and when defendant opened it, he told defendant the police were there to talk to him.

*Defendant's Former Girlfriend, A.*
Defendant is A.'s ex-boyfriend. A., age 29, met defendant in 2013 and started dating him "[p]retty much immediately." He moved from Kentucky into her house in Indiana with her and her daughter. From Indiana, A. moved to California with defendant and without her daughter in February of 2014. A. is on probation out of Wyoming for a marijuana transportation conviction.

A.'s relationship with defendant was rocky from the start. She worked two full-time jobs as a cook, but "he got the check. He was in total control of where that check went." The majority of the time, he did not work. He was controlling about other things as well. When she had a phone, he had to be able to see who she was contacting on Facebook and other social media. If she went anywhere, he would go with her. Eventually, he would not allow her to have a cell phone or

8

friends. Her family did not accept him, and it really strained that relationship. She stayed with him because she loved him and, at times, felt he loved her.

However, he started becoming aggressive with her within the first month, every time he did not have money. "[W]hatever he needed now, he needed now." There was no distracting him or negotiating with him. The first violent act occurred at Christmas when he choked her while she was wearing a pearl necklace. The choking left indentations on her chest from the pearls. Her chest still hurt the next day. That was the only time he choked her, but he hit her several times. The blows occurred randomly. Once, he woke her up and started hitting and kicking her until she fell off the bed because of something he found on Facebook. That time her whole body was bruised. During one week in October, defendant punched her twice in the eyes, each time giving her a black eye. The first time that week, they were staying at his ex-stepfather's house in Contra Costa County, and defendant punched her in the eye as she walked in the door after work because she was late coming home on BART. Later in the week, he hit her in the eye again for complaining about how she disliked having to walk down the street with people looking at her because she had a black eye. Another time, he hit her in the eye four times while she was asleep on the couch. Another time, while she was driving them from Indiana to Kentucky, defendant twisted and broke two fingers on her dominant hand because she refused to give him her debit card, which was in the purse she was clutching.

Defendant also loved to berate her about her weight and criticize her clothes. Calling her "bitch" and "whore" was normal conversation for him. He also threatened to call the courts to make sure she never saw her 13–year-old daughter.

The final straw came on December 14, 2014. Defendant's ex-stepfather had changed the locks on the house and defendant had spent the night in the garage. She and defendant had "already kind of tied our relationship off" and he was in a new relationship. That morning, defendant began "raising all kinds of hell" and smacked a coffee cup out of his ex-stepfather's hand because he felt A. should have been homeless instead of him. Defendant's ex-stepfather had called the police and they arrived. A. had never called the police on defendant, but defendant threatened to kill her or have somebody beat her up if he went to jail. That same day she filed for an emergency restraining order in which she outlined defendant's prior acts of violence as she had described them in her testimony, except not in as much detail. Ultimately, it was granted. A. identified a multi-page document (People's Exh. 3) as her application for a restraining order and order. There was a hearing on her application at which she, defendant, and defendant's ex-stepfather testified. She currently had a restraining order against defendant.

Despite the restraining order, A. occasionally had contact with defendant from December 2014 through the winter of 2015 and in late March or early April she had a romantic reconciliation with defendant that lasted five days. Defendant promised things were going to be better and he had changed his ways. Defendant told A. that "[h]e had appreciated me for all the things that I'd done for him. She was too

young and didn't understand, like, how to be mature and take care of a man. He needed that." He was not at all abusive during those five days. However, he had no money, and on her payday, he got her check. If she was at work, he was with M.; if M. was at work, he was with her. A. decided that "[m]inus the physical abuse, it was the same nonsense that I left." She left again.

A. had never met M., but she had talked to her about 10 times. M. would call her for advice on how to understand or handle defendant. On the final day she left, A. called M.'s phone and asked if defendant was with her. M. said he was. A. told her to tell defendant that she was getting her stuff and leaving, and he should not attempt to contact her or ask where she lived.

A. did not speak to defendant again until April 2015, when he called from jail. He called her 30 times the first day. She did not answer all the calls. She did talk to him three times. The first time, he wanted her to post bond for him. Eventually, she called the jail to report she had a restraining order against defendant. After that, the calls from the jail stopped. A. was afraid if defendant got out of jail the next week he would be on her doorstep. However, she has taken measures to change her phone number, address, transportation, and living arrangements to protect herself from that possibility.

***The Defense Case***
Defendant testified in his own behalf. Defendant denied the rape, robbery, and false imprisonment accusations on April 24. He admitted "smack[ing]" M. in the face. He admitted throwing tequila in Summers's face, but not choking Summers.

In November 2014, defendant was living with his former stepfather and offered A. a place to live while she "got on her feet" after a spot of trouble in Wyoming. They were romantically involved. He met M. in November 2014 and began a romantic relationship with her. He moved in with M. because he was forced to move out of his stepfather's house, and he and A. had mutual restraining orders out for each other. He and M. stayed with a coworker and in hotels until they found the place on Havenscourt in late January or early February of 2015. At some point, on a Monday, he and M. got into an argument and M. "just up and left." He decided he was "tired of this" and packed her clothes. He invited A. to come over and she stayed about a week. On Tuesday, he was not home when M. came and got her clothes, trashed the bedroom, "plopped up" his air mattress, took his "weed" and wrote on his mirror. Defendant asked Summers if he told M. anything about A. being in the house, and Summers said no.

Defendant had quit his job and his last check had been mailed to his stepfather's house. A. brought him his mail, including the check. On Friday, M. took him to cash his check. M. and A. spoke on the phone. When he and M. returned to the house, A. and her things were gone. M. moved back in that day. He and M. had a talk, and M. told him that she and Summers had teamed up to trash the room, that Summers was the one who had written on the mirror, and that he had "went on about" defendant leaving M. for A. Defendant made up his mind to talk to Summers about why he was in defendant's business. But before he could do so, Summers started texting defendant during one

of his "drunk spells" that defendant had "no reason to come at" Summers for what defendant and M. were doing, and that he was "ashamed" he had any involvement with either of them. In response, defendant texted him back that he needed to stay out of defendant's business. The next time he saw Summers, defendant verbally confronted him about it.

The next day, a female former coworker was at the house and she asked defendant if he and Summers were going to have a problem or if everything was going to be cool. Defendant said there was no problem. Summers and the woman had a bottle of tequila and offered him a drink, but Summers was still "on the rampage" about him and M. When Summers refused to agree to stay on his side of the house, defendant threw some tequila in his face.

On April 25, defendant and M. were having some disagreements about a trip to Las Vegas. At the time, defendant was not working, but he had a cannabis license and was making some money by growing marijuana in the house and selling it to the cannabis store. This would partially fund the trip, and "[M.] was working." When defendant told M. that he was going on the trip without her, M. was upset. But she cheered up when he told her he had gotten a new job, and they had sex to celebrate. At the time, they were having a lot of sex, because they were trying to have a baby. Also, he promised to take her to Paris for his birthday, which he planned to pay for with the money from his first paycheck.

Defendant dropped M. off at work and went to a friend's house to play video games and smoke marijuana while he waited for M. to get off work at 1:15 a.m. They went to a birthday party for one of M.'s coworkers. M. bought herself a drink but did not buy one for him, so he bought one for himself. While she socialized at one end of the bar with "the birthday boy and the boyfriend" he was watching some girls dance from the other end. When they left the bar, M. was apparently annoyed; she asked if he wanted to leave with one of the dancing girls. M. drove home recklessly. She unplugged the music jack in the car so he could not listen to a song. Once they got home, she threw the car keys at him. Inside, she grabbed her shampoo and soap and went to take a shower. Defendant hid M.'s cell phone in a bag under a table in their room so that she would not be able to call him. While M. was in the shower, defendant went into the bathroom and told her maybe she should move out, and that he was going to a friend's house. He went directly to the car.

While defendant was backing up to leave, M. appeared behind the car wearing only her underpants. He got out of the car and they argued. She spit in his face and swung a baseball bat at his knee, so he "smacked her" in the face. She let go of the bat and fell or "plopped" to the ground behind her car. M. kept going on about how she could not believe he hit her. He exhorted her to get up, and tried to mollify her by offering to smoke a "blunt" of marijuana with her, take her to Taco Bell, and then go to bed. When M. finally went back into the house, he drove away to visit a friend. Returning home, defendant found M. was gone. Her purse and clothes were still there, her phone was still in the bag where he had hidden it, and the baseball bat was propped up by the wall. Defendant smoked a blunt and passed out.

The next thing he knew, Summers was in his room announcing the police were at the door. Defendant went to meet them, but the police "just barged in and blocked me out" without an arrest or search warrant.

Defendant learned in the police car he was being charged with rape. Defendant was "mind-boggled" because nothing like this had ever happened to him. He was taken for a SART exam at Santa Rita. He asked the examining nurse: "It's 2015. I'm sure you can tell if a person's been raped. She said yes."

Defendant testified about the evening in San Francisco. They went to a bar where defendant and M. drank, smoked weed, and took an Ecstasy pill while listening to music. Until the Ecstasy kicked in, defendant was not very sober that night. He remembered stumbling and falling. M. drove them back to Oakland. M. drove to the garage at her mother's home. They started arguing, and M. threw some kind of glass bottle at his jaw. It hit his face and cracked a tooth. "It was a powerful blow." He jumped out of the car, grabbed her by the arms and shook her for 20 to 25 seconds, because he was in "excruciating pain." M. told him to take the car and come back in the morning. He took the car and went home. Defendant testified that April 25 and that night were the only two times he used physical force on M.

Defendant testified about his relationship with A. When he met her, she was romantically involved with his cousin in Kentucky. Defendant was going between Kentucky, where weed is not legal, and California, where he was growing it. A. went with him to California to get away from her problems. On their trip, they got pulled over in Wyoming and marijuana was found. He was locked up for five months, and she was locked up for a bit longer. When he was released he continued on to California and she eventually followed him there.

Defendant agreed he and A. had a very abusive relationship. "[S]he would throw things. She would always—it was, you know, really mental and physical. That was kind of the reason for me ultimately getting a restraining order. [¶] ... [¶] We both have restraining orders on each other."

Defendant admitted he had three felony convictions: one for forgery and one for commercial burglary in 1997 out of Contra Costa County, and another stemming from the Wyoming incident, for which he was on probation.

Defendant had two tattoos: one said Pimp Money Dog. It was a nickname he acquired as a freshman in high school because he was well-liked by women. The other said, "God's Gift to Women." He was very confident he could get any woman he liked to be with him. In fact, he overheard the prosecutor say she was glad to be in his presence.

*People v. Olive-Goffner*, No. A146432, 2017 WL 5494973, at *1–8 (Cal. Ct. App. Nov. 16, 2017)

(unpublished).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### III.     DISCUSSION

#### A.     Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established Federal law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court

1   identifies the correct governing legal principle from [the Supreme] Court's decisions but

2   unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal

3   habeas court may not issue the writ simply because that court concludes in its independent

4   judgment that the relevant state-court decision applied clearly established federal law erroneously

5   or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

6          On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating

7   state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."

8   *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above

9   standards on habeas review, the Court reviews the "last reasoned decision" by the state court. *See*

10  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th

11  Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

12         In its unpublished disposition issued on November 16, 2017, the state appellate court

13  addressed the merits of the claims relating to the trial court's purported errors in admitting

14  evidence of Petitioner's interactions with the roommate, Summers; admitting testimony from

15  Petitioner's ex-girlfriend ("A."); and refusing to allow Petitioner to present his restraining order

16  against A. *See Olive-Goffner*, 2017 WL 5494973, at *8-15. The trial court also held that there was

17  "no cumulative prejudice from the assumed errors." *Id*. at *15. Therefore, the last reasoned

18  decision as to these claims is the California Court of Appeal's unpublished disposition. *See*

19  *Wilson*, 138 S. Ct. at 1192; *Cannedy*, 706 F.3d at 1156.

20         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

21  *Stancle v. Clay,* 692 F.3d 948, 957 & n.3 (9th Cir. 2012). Where the state court reaches a decision

22  on the merits but provides no reasoning to support its conclusion, a federal habeas court

23  independently reviews the record to determine whether habeas corpus relief is available under

24  section 2254(d). *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).

25         When presented with a state court decision that is unaccompanied by a rationale for its

26  conclusions, a federal court must conduct an independent review of the record to determine

27  whether the state court decision is objectively reasonable. *See Delgado v. Lewis*, 223 F.3d 976,

28  982 (9th Cir. 2000). This "[i]ndependent review . . . is not de novo review of the constitutional

United States District Court
Northern District of California

14

1    issue, but rather, the only method by which [a federal court] can determine whether a silent state

2    court decision is objectively unreasonable." *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir.

3    2003). "Where a state court's decision is unaccompanied by an explanation, the habeas

4    petitioner's burden still must be met by showing there was no reasonable basis for the state court

5    to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

6        The Supreme Court has repeatedly affirmed that under AEDPA, a federal habeas court

7    must give a heightened level of deference to state court decisions. *See Hardy v. Cross*, 132 S. Ct.

8    490, 491 (2011) (per curiam); *Harrington*, 562 U.S. at 97-100; *Felkner v. Jackson*, 131 S. Ct.

9    1305 (2011) (per curiam). As the Court has explained, "[o]n federal habeas review, AEDPA

10   'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-

11   court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation omitted). With these

12   principles in mind, the Court addresses Petitioner's claims.

### B.    Petitioner's Claims

14       Petitioner raises the following four claims:

15       (1) the trial court erred in admitting evidence of Petitioner's interactions with a roommate

16   ("Summers") to show intent and motive;

17       (2) the trial court erred in permitting Petitioner's former girlfriend ("A.") to testify under

18   section 1109 of the California Evidence Code;

19       (3) the Court erred in refusing to permit Petitioner to present evidence of his restraining

20   order against A. to impeach her; and

21       (4) cumulative error.

22   *See* Dkt. No. 1 at 5-6.

23       The Court will first address Claims 1 and 2, in which Petitioner argues that the trial court

24   erred in admitting propensity evidence. *See* Pet., Ex. A at 27-52 (attaching the argument raised to

25   the California Court of Appeal as argument in support of the Petition). Next the Court will address

26   Claim 3, in which Petitioner argues the trial court erred in excluding evidence. *See id.* at 53-56.

27   Finally, the Court will address Claim 4. *See id.* at 57-58.

28

United States District Court
Northern District of California

### i.   Claims that Evidence Was Admitted in Error (Claims 1 and 2)

In Claim 1, Petitioner claims that the trial court inappropriately admitted evidence of his interactions with his roommate, Summers, to show intent and motive, thereby abusing its discretion under California Evidence Code §§ 1101 and 352. Pet. at 27-39. Petitioner further claims that his federal due process rights were violated by the admission of this propensity evidence, rendering his trial fundamentally unfair. *See id.*

In Claim 2, Petitioner claims that the trial court erred in permitting Petitioner's ex-girlfriend, A., to testify California Evidence Code §§ 1109 regarding Petitioner's propensity to commit domestic violence. *See id.* at 40-56. As with Claim 1, Petitioner argues that his federal due process rights were violated by the introduction of this propensity evidence. *Id.*

In one section of its decision, the state appellate court resolved Petitioner's challenges both to the admission of A's testimony, and to testimony by Summers. Thus, this Court will do the same and resolves Claims 1 and 2 below.

### a.  State Court Opinion

The state appellate court outlined the applicable state law, including the relevant state cases, and rejected both Claims 1 and 2 as follows:

> Defendant argues the trial court abused its discretion in admitting A.'s testimony under Evidence Code section 1109, and Summers's testimony under Evidence Code section 1101, subdivision (b). We find the that A.'s testimony was properly admitted as propensity evidence under Evidence Code section 1109. We also find the court erred in admitting Summers's testimony to prove criminal intent generally, but find it was relevant to negate self-defense, accident or mistake, to show motive, and to shed light on the relative credibility of defendant and M. To the extent the court misadvised the jury on the limited purpose for which Summers's testimony could be used, we find the error harmless. . . .
>
> **Evidence Code Sections 1101 and 1109: General Principles**
> Generally speaking, evidence of other crimes is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crimes charged. (Evid. Code, § 1101, subd. (a).). [FN 2] Evidence of other crimes by a defendant is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act ... did not reasonably and in good faith believe that the victim consented) other than [the defendant's] disposition to commit such [crimes]." (Evid. Code, § 1101, subd. (b).) "'Evidence of

16

uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent.'" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*).) "If evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, common plan, or identity, the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."'" (*Ibid.*)

[FN 2: Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."]

Evidence Code section 1101, subdivision (c) "is [not] concerned with evidence of character offered on the issue of the credibility of a witness...." (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Pen. Code (2009) foll. § 1101, p. 221.) Consequently, the only limitation on the use of character evidence to support or attack credibility is Evidence Code section 352, which was not abrogated by the constitutional Truth–In–Evidence provision of the California Constitution (Cal. Const., art. I, § 28, subd. (f)(2); *People v. Ramos* (1997) 15 Cal.4th 1133, 1179.)

The general rule barring propensity evidence has two significant exceptions, one for prior sex crimes (Evid. Code, §§ 1108) and one for prior domestic violence, or elder, dependent person, and child abuse. (Evid. Code, § 1109, subds. (a)(1)–(a)(3); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159–1160.) As relevant here, Evidence Code section 1109 [FN 3] allows the admission of uncharged acts of domestic violence that would otherwise be made inadmissible by section 1101, subdivision (a), to show the defendant's propensity to commit domestic violence offenses, subject to review under Evidence Code section 352. [FN 4] (*People v. James* (2010) 191 Cal.App.4th 478 (*James*); *People v. Loy* (2011) 52 Cal.4th 46, 62.) The prior and charged offenses are considered sufficiently similar if they are both

offenses "involving domestic violence." (*James*, at p. 484 [burglary involving domestic violence]; *People v. Frazier* (2001) 89 Cal.App.4th 30, 41 (*Frazier* ) [sex offenses].)

[FN 3: Evidence Code section 1109 provides, in relevant part: "(a) (1) [I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352. [¶] ... [¶] (d)(3) 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."]

[FN 4: Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."]

We review the admission of other crimes evidence under Evidence Code sections 1101, 1109, or 352 for abuse of discretion. (*Foster, supra,* 50 Cal.4th at pp. 1328–1329 [Evid. Code, §§ 1101, 352]; *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145 (*Ogle* ) [Evid. Code, § 1109].)

**A.'s Testimony in its Entirety Was Admissible as Evidence of Prior Abuse Under Evidence Code Sections 1109 and Family Code Sections 6211 and 6320.**

Defendant contends the trial court abused its discretion in permitting A. to testify that defendant (1) controlled her financially; (2) controlled what friends she could have; (3) controlled her cell phone use; (4) controlled the way she dressed; (5) had access to everything, including her phone and social media contacts; (6) was not accepted by her family; (7) needed everything "now" and was impossible to negotiate with; (8) would take whatever he wanted by any possible means; (9) stole money from his own family and had A. borrow money from hers; (10) loved to destroy her body image; (11) called her "whore" and "bitch" on a regular basis; (12) threatened to call the courts to prevent her from seeing her daughter; (13) cheated on her; (14) could have been a great person and had a great life but threw it away; and (15) called A. repeatedly from jail after his arrest. He also complains about her testimony that defendant's stepfather changed the locks on his home to prevent him from living there, and that she feared he would be on her doorstep if he got of jail the next week. Defendant argues this testimony went "far beyond anything permitted by Evidence Code section 1109 and instead constituted precisely the sort of character-based portrait that is prohibited by Evidence Code

section 1101, subdivision (a)."

Defendant's claim is not well taken. Evidence Code section 1109 was designed to allow admission of evidence that is inadmissible under section 1101, subdivision (a), i.e., evidence of a person's character or a trait of character to prove propensity or criminal disposition. Evidence Code section 1101, subdivision (a) specifically excepts from its ambit evidence admissible under Evidence Code section 1109. "[I]n enacting Evidence Code section 1109, the Legislature found that in domestic violence cases evidence of prior acts is particularly probative in demonstrating the propensity of the defendant. '"The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of *dominance and control*, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked."' ( [*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027–1028], quoting Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, at pp. 3–4.)" (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 705–706; italics added.)

Defendant also argues that the details of defendant's treatment of A. were irrelevant, i.e., "had no connection to the subject of domestic abuse or the statutory language that ostensibly justified their admission." We disagree. "Section 1109 applies if the offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition." (*Ogle, supra,* 185 Cal.App.4th at p. 1144.) As the *Ogle* court explained, Evidence Code section 1109 "defines domestic violence as having the meaning set forth in Penal Code section 13700, and the further meaning set forth in Family Code section 6211, so long as the act occurred within five years of the charged offense, subject to a hearing under Evidence Code section 352." (*Ogle*, at p. 1143.) While section 13700's definition of domestic violence requires either bodily injury, attempted bodily injury, or placing the victim in reasonable apprehension of imminent serious bodily injury to the victim or another person, "Family Code section 6211 defines domestic violence to require abuse and Family Code section 6203, subdivision (d) defines 'abuse' to include 'engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320, subdivision (d).'" (*Ogle*, at p. 1144.) Family Code section 6320 authorizes the court to enjoin a party from engaging in a wide range of misbehaviors, including "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, ... harassing, telephoning, ... destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and ... of other named family or household members." (Fam. Code, § 6320, subd. (a).)

The touchstone of admissibility under Evidence Code section 1109 is sufficient similarity between the charged and uncharged offenses to permit the inference that defendant had a propensity to commit acts of domestic abuse. (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 [§ 1108]; *James, supra,* 191 Cal.App.4th at p. 484; *Frazier,*

19

*supra,* 89 Cal.App.4th at pp. 40–41.) "Section 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess) June 25, 1996, p. 5 (Assembly Analysis of Senate Bill [No.] 1876).) Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532.)

It follows that the more similar the situations, the stronger the inference. Here, both women were romantic partners who cohabited with defendant. M. and A. gave striking similar accounts of defendant's physically and emotionally controlling behaviors. These included not only slapping and choking both women, but also monitoring and restricting their access to social media and alienating them from their families, all of which qualify as harassment. Both women also testified defendant made repeated telephone calls to them despite restraining orders, and disturbed the peace of other family (stepfather) or household (Summers) members. These acts fell well within the parameters of Family Code sections 6211 and 6320, or section 13700 of the Penal Code. Furthermore, to the extent A. may have testified to a very few things which did not strictly echo M.'s account (i.e., stole money from his own family, could have had a great life but threw it away), defendant's failure to object to those instances waives the point. Nor is it reasonably probable defendant would have obtained a more favorable verdict if those comments had been stricken. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

*People v. Disa* (2016) 1 Cal.App.5th 654, on which defendant relies, is distinguishable. There, Division Two of this court concluded that in a prosecution for the defendant's murder of his girlfriend by carotid restraint hold, the trial court abused its discretion in allowing detailed evidence that the defendant entered a former girlfriend's apartment with a knife when she was not home, lay in wait for her for hours hidden in a closet, then slashed her and her current partner while they were asleep in bed. (*Id.* at pp. 673–674.) The *Disa* court did not find it was error to admit some evidence of the prior incident under Evidence Code section 1109, despite its dissimilarities, but it deemed evidence of the inflammatory details of the prior offense far more prejudicial than probative and not specifically relevant to show propensity. (*Disa,* at pp. 673–674 & fn. 13.) Here, the many details provided by A. about her relationship with defendant were not more inflammatory than the details provided by M. about her relationship with defendant, and the similarities between the two relationships enhanced the probative value of the evidence.

In our view, defendant's maltreatment of A. was sufficiently similar to his maltreatment of M. to support the inference that defendant has a propensity to abuse romantic partners with whom he cohabits. Accordingly, the trial court did not abuse its discretion in concluding A.'s testimony was admissible as evidence of prior "domestic violence" within the meaning of Evidence Code section 1109, or by instructing the jury on propensity evidence. No error appears.

**Summers's Testimony Was Not Admissible to Prove Intent Generally, But It Was Admissible to Negate Self-defense, Mistake or Accident, Motive, and to Corroborate or Contradict the Witnesses' Testimony.**

The trial court admitted Summers's testimony about his encounters with defendant under Evidence Code section 1101, subdivision (b) to show intent. The court ruled that defendant's conduct towards Summers—throwing tequila, sending threatening texts, verbally threatening to injure him, grabbing Summers by the throat and banging Summers's head against the wall—coupled with the fact that Summers was a "housemate or cohabitant with the defendant in the same home" and "not a stranger" in a bar or on the street, was similar enough to his conduct towards M., a romantic partner and cohabitant, "to support the inference that defendant probably harbored the same intent in each instance, that is, the uncharged offense and the charged offense." The trial court did not identify the intent at issue. The prosecutor argued the intent at issue was the intent to use the "same mechanism"—choking and threats of violence—"to intimidate another person so as to gain compliance from that individual, thus allowing him to achieve his ultimate goal." Defense counsel objected that the identified intent was "overly expansive" and likely to be used as evidence the defendant had a propensity to use violence to get his way. [FN 5]

> [FN 5: The prosecutor did, in fact, suggest the evidence was admissible as propensity evidence under Evidence Code section 1109 "because he is living in common, falls under the umbrella of domestic violence in that sense," a suggestion the Attorney General also advances without actually espousing in a footnote. The Attorney General's theory is that Evidence Code section 1109 incorporates the definition of "domestic violence" included in Family Code section 6211, as long as the prior act occurred no more than five years before the charged offense and satisfies Evidence Code section 352. (Evid. Code, § 1109, subd. (d)(3).) Family Code section 6211 defines "domestic violence" as abuse perpetrated against a "cohabitant or former cohabitant, as defined in Section 6209." (Fam. Code, § 6211, subd. (b).) Family Code section 6209 defines a "cohabitant" as "a person who regularly resides in the household." (See *People v. Dallas* (2008) 165 Cal.App.4th 940, 953, holding in a child abuse prosecution, that evidence of prior acts of abuse against the child of a former girlfriend was admissible as propensity evidence under section 1109 because the defendant's former girlfriend's child lived with them and was a cohabitant under Family Code section 6209. But see *People v. Taylor* (2004) 118 Cal.App.4th 11, 18, *People v. Moore* (1996) 44 Cal.App.4th 1323, 1333, and *People v. Holifield* (1988) 205 Cal.App.3d 993, 1000 defining "cohabitant" as persons living together in a substantial relationship manifested by permanence and sexual or amorous intimacy for the purposes of

Penal Code sections 13700 and 273.5.) We need not and do not address this issue because the parties have not briefed it.]

"'To be admissible to show intent, "the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance." [Citations.]' [Citation.] Additionally, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.)" (*People v. Jones* (2012) 54 Cal.4th 1, 50.) Summers's testimony was not admissible to prove intent. "Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with *the intent that comprises an element of the charged offense*. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2, second italics added; see *People v. Balcom* (1994) 7 Cal.4th 414, 422.) Intent to control or intimidate another person into doing one's bidding is not an elemental intent for any of the crimes with which defendant was charged. Therefore, it was irrelevant whether he harbored that "same intent" when he threatened and choked Summers and beat, raped, robbed, and falsely imprisoned M.

Moreover, defendant testified to consensual sex *earlier in the day*, but *denied* he engaged in any sexual act with M., or robbed her, or held her hostage in the house, or choked her on the night of April 25. On the evidence presented, the primary issue was whether he committed the acts alleged. "No reasonable juror considering this evidence could have concluded that defendant committed the acts alleged by the complaining witness, but lacked the requisite intent to commit rape," sexual penetration, robbery, and false imprisonment. (*Balcom*, *supra*, 7 Cal.4th at p. 422.)

On the charge of inflicting corporal injury on a cohabitant, defendant denied he engaged in the pitched battle in the bedroom to which M. testified. If the jury accepted M.'s version of events, once again there could be no reasonable dispute defendant did so with the requisite criminal intent. But he admitted he "smacked" M., after M. spit in his face and swung a baseball bat at his knee outside the house. The jury received self-defense instructions on that theory. The prior misconduct evidence from Summers was marginally relevant to negate self-defense, mistake or accident, on the chance the jury found defendant only smacked M. once, outside the house. In our view, admitting evidence that defendant threatened, choked, and banged a housemate's head against the wall to negate the inference that defendant smacked M. in self-defense, or by mistake or accident, was akin to killing "a gnat with a sledgehammer." (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1160.) The value of Summers's testimony on such a narrow issue was negligible, and if it was the only basis for admission, excludable as more prejudicial than probative under Evidence Code section 352.

However, the evidence was also admitted to show motive, and the jury was instructed that it could consider Summers's testimony "for

the limited purpose of determining if it tends to show: [¶] [The existence of the intent which is a necessary element of the crime charged]" *and/or* a "motive for the commission of the crime charged." The late Justice Jefferson explained: "'"Motive is itself a state-of-mind or state-of-emotion fact. Motive is an idea, belief, or emotion that impels or incites one to act in accordance with his state of mind or emotion. Thus, evidence, offered to prove motive, that defendant committed an uncharged offense meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle that one tends to act in accordance with his state of mind or emotion." [Citations.]' [Citations.] ... '[Evidence Code] section 1101, subdivision (b) makes *admissible* the other-crimes evidence when relevancy is predicated on a state-of-mind or state-of-emotion fact which, in turn, leads to an inference of the existence of that same state-of-mind fact at the time of the charged offense, or, that defendant acted in accordance with his state of mind and committed the charged offense.'" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1383, quoting Jefferson, Cal. Evidence Benchbook (1978 supp.) Special Problems Related to Relevancy, § 21.4, p. 218.) "Justice Jefferson's definition is consistent with the common dictionary definition of motive. (See, e.g., Merriam–Webster < http://www.merriam-webster.com/dictionary/motive> (as of May 2, 2011) [defining motive as 'something (as a need or desire) that causes a person to act']; American Heritage Dictionary (1973) pp. 856–857 [defining motive as '[a]n emotion, desire, psychological need, or similar impulse acting as an incitement to action.'].)" (*Spector*, at p. 1383.) To be relevant for such purpose the charged offenses must "share common features." (*People v. McDermott* (2002) 28 Cal.4th 946, 999.) In our view, it was not error to admit Summers's testimony and allow the jury to infer that defendant's motive for using violent tactics on persons with whom he shared living quarters was to control or intimidate them into doing his bidding.

It is also worth noting that Summers's testimony was relevant, and admissible, subject to Evidence Code section 352 concerns, to the credibility of the witnesses. (*People v. Stern* (2003) 111 Cal.App.4th 283, 296–297.) To some extent, Summers corroborated M.'s testimony about what she testified she heard and saw defendant do to Summers after she reconciled with defendant. Summers's testimony also contradicted defendant's testimony about the incident. Generally speaking, we will uphold a ruling that is right for the wrong reasons. (*Cape Concord Homeowners Assn. v. City of Escondido* (2017) 7 Cal.App.5th 180, 193.)

**The Error, If Any, Was Harmless**

To the extent the court erred in admitting Summers's testimony to prove intent generally, we find the error harmless in this case. The danger in admitting Summers's testimony was that the jury might consider it as proof of propensity to commit domestic abuse. However, the jury was specifically instructed to not consider his testimony for propensity, thus minimizing the potential for improper use. (*Foster, supra*, 50 Cal.4th at p. 1332.) Importantly, there were other legitimate ways in which the jury could view Summers's testimony. Moreover, Summers's testimony was not the only prior misconduct evidence admitted at trial. A.'s testimony, which was properly admitted to show a propensity to commit violent acts against

romantic partners, was also relevant to motive and credibility. A.'s story was strikingly similar to M.'s.

It is true that A. did not testify defendant ever raped her, but other evidence adduced at trial supported M.'s credibility on that point: Police officers corroborated that M. was so traumatized she ran nearly naked in the street to find police protection, and she told at least two police officers and the SART nurse she was raped. While she did not tell the first police officer she met in the street about the rape, her explanation for not doing so was understandable under the circumstances. And Summers's testimony was neutral with respect to the rape charge: he neither saw nor heard the events of that night, and defendant's attack on him was not sexually motivated.

Finally, defendant repeatedly argues that the evidence of rape was weak because M. did not suffer genital injury. We disagree. The SART nurse testified genital injuries are not present in a significant percentage (37 percent) of cases where the victim has previously had consensual sex with her attacker and does not fight back. And M. did, in fact, have bruises on her arms and legs that were consistent with being held down while her thighs were forcibly pulled open.

We reject defendant's claim that any assumed error was of constitutional magnitude. (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) Any error was one of state law, and it is not reasonably probable that defendant would have obtained a more favorable result if Summers's testimony had been excluded. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

*Olive-Goffner*, 2017 WL 5494973, at *8–14.

### b. Applicable Federal Law

As noted, *supra*, Petitioner argues that the admission of A.'s and Summers's statements was erroneous because these witnesses' testimony "functioned as pure propensity evidence to tarnish [Petitioner's] character." Pet., Ex. A at 27 (arguing that Summers's testimony should not have been admitted); *see also id.* at 43 (arguing that admitting A.'s testimony "opened the floodgates to a devastating character attack").

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031

United States District Court
Northern District of California

(9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). Evidence violates due process only if "there are *no* permissible inferences the jury may draw from the evidence." *Jammal*, 926 F.2d at 920 (emphasis in original). Evidence must "be of such quality as necessarily prevents a fair trial" for its admission to violate due process. *Id.* (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)). Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)). Therefore, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Id.* (quoting 28 U.S.C. § 2254(d)).

The Supreme Court has specifically left open whether admission of propensity evidence violates due process. *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991) ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (affirming that under *Alberni* admission of propensity evidence is not contrary to clearly established law for purposes of federal habeas review because "no Supreme Court precedent establish[es] that admission of propensity evidence . . . to lend credibility to a sex victim's allegations, and thus indisputably relevant to the crimes charged, is unconstitutional"). *See, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008)

(because Supreme Court expressly reserved the question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim did not unreasonably apply clearly established federal law). The absence of a Supreme Court holding that admission of prejudicial evidence or propensity evidence violates due process precludes relief under § 2254(d). *See generally Carey v. Musladin*, 549 U.S. 70, 77 (2006) (given the lack of holdings from the Supreme Court on point, it could not be said that the state court unreasonably applied clearly established federal law for purposes of § 2254(d)(1)).

### c.  Analysis

Under these binding authorities, the state appellate court's rejection of Petitioner's due process claim does not warrant granting federal habeas relief under AEDPA, because a California trial court's admission of evidence to show propensity does not violate any principle of clearly established federal law. *See Holley*, 568 F.3d at 1101.

### 1.  A's testimony

Petitioner argues that testimony from his ex-girlfriend, A., should not have been admitted under California Evidence Code section 1109.[3]  The state appellate court disagreed, and found that A's testimony was admissible under section 1109.

As noted above, the United States Supreme Court has never held that the admission of evidence of prior crimes violates the right to due process. *See Estelle*, 502 U.S. at 75 n.5; *Alberni*, 458 F.3d at 864-67. Because habeas relief may not be granted unless the state court decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, *see* 28 U.S.C. § 2254, and there is no Supreme Court precedent on point, the decision of the appellate court cannot be said to have contradicted or unreasonably applied clearly established federal law in upholding the ~~constitutionality~~ admission of A.'s testimony under section 1109. *See Alberni*, 458 F.3d at 866-67 (under AEDPA, habeas relief cannot be granted on

---

[3] Petitioner argues that, if this Court finds that his claim was waived by trial counsel's failure to object, then the Court should find that trial counsel's failure to object constituted ineffective assistance. *See* Pet., Ex. A at 50-52. Respondent does not argue, and this Court does not find, that Petitioner's claim was waived. Accordingly, the Court need not examine whether trial counsel was ineffective in failing to object.

claim Supreme Court has reserved); *id*. at 874-75 (although habeas relief may still be available after AEDPA on reserved issues, as to propensity evidence there is insufficient Supreme Court authority of any kind to clearly establish a due process right not to have such evidence admitted) (McKeown, J., concurring in part and dissenting in part).

Finally, even if Petitioner raised a cognizable due process claim, habeas relief would still be unavailable because the admission of evidence was not arbitrary "or so prejudicial that it rendered the trial fundamentally unfair." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). The admission of evidence violates due process only if there are no permissible inferences that the jury may draw from the evidence. *See Jammal*, 926 F.2d at 920; *see also Terrovona v. Kincheloe*, 912 F.2d 1176, 1180-81 (9th Cir. 1990) (admission of prior bad act testimony did not violate due process where trial court balanced probative weight against prejudicial effect and gave jury cautionary instruction). Here, Petitioner previously committed separate incidents of domestic violence and contends that the evidence of past acts should have been excluded because it lacked probative value and was unduly prejudicial. At least one incident of violence against A. involved Petitioner choking A. *See Olive-Goffner*, 2017 WL 5494973, at *5. This is pertinent to the attack at issue here, in which Petitioner choked the victim. *See id*. at *11 ("the more similar the situations, the stronger the inference"). Moreover, Petitioner's attacks on A. were less inflammatory than his offense against the victim, and so A's testimony as to these attacks was not unduly prejudicial. Accordingly, the trial court did not violate Petitioner's due process rights by admitting A's testimony.

### 2. Summers's testimony

Petitioner argues that testimony from his housemate Summers should not have been admitted under California Evidence Code section 1101(b). The state appellate court found that Summers's testimony was admissible under section 1101(b) to show motive, and to negate any claim of self-defense, mistake, or accident.

The state court's denial of Petitioner's claim was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Assuming *arguendo* that the prior acts evidence was prejudicial, this does not

United States District Court
Northern District of California

27

warrant federal habeas relief. As discussed above, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101.  Moreover, motive is a permissible inference that the jury could draw from the evidence of prior acts. *See Brown v. Henry*, 217 F.3d 844 (9th Cir. 2000) ("We determine that no constitutional violation resulted because the jury could have drawn the permissible inference from such evidence that Brown did not act in self-defense and it was also relevant to prove motive and intent."); *Noel v. Lewis*, 605 F. App'x 606, 609 (9th Cir. 2015) (stating that motive was a "permissible inference[]" that "could have been drawn" from challenged evidence); *Duong v. McGrath*, 128 F. App'x 32, 34 (9th Cir. 2005) (same).

Nor was the state court's denial of this claim based on an unreasonable determination of the facts in light of the evidence presented in the trial court. The jury could permissibly draw the inference that Petitioner's motive in using violence against co-habitants was "to control or intimidate them into doing his bidding."[4]  *Olive-Goffner*, 2017 WL 5494973, at *13; *see also United States v. Sommerstedt*, 752 F.2d 1494, 1499 (9th Cir.) (finding that "testimony was clearly relevant to show [the defendant-appellant's] alleged motive and intent to intimidate), *amended,* 760 F.2d 999 (9th Cir. 1985). The trial court instructed the jury that Summers's testimony as to Petitioner's prior violent acts could only be considered "'for the limited purpose of determining if it tends to show: [¶] [The existence of the intent which is a necessary element of the crime charged]' *and/or* a 'motive for the commission of the crime charged.'" *Olive-Goffner*, 2017 WL 5494973, at *13. The jury was thus instructed to use Summers's testimony for a permissible reason: to infer motive.

Moreover, Summers's testimony tended to negate Petitioner's claim that his victim was untruthful. *See id*. at *14 ("Summers's testimony also contradicted defendant's testimony about the incident."). As the state appellate court found, even if Summers's testimony were not

---

[4] Indeed, Petitioner's use of violence to achieve his goals appears to have been successful: after Petitioner told Summers "to stay out of [Petitioner's] business," and choked Summers, Summers "rarely stayed in the house because he was in fear of his life from [Petitioner]." *Olive-Goffner*, 2017 WL 5494973, at *5.

United States District Court
Northern District of California

admissible to probe motive, it would be admissible for this separate purpose. *See id*.

Finally, even if the trial court had erred by admitting Summers's testimony, any such error did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry*, 532 U.S. at 795 (2001). Petitioner's victim testified about the attack, and her testimony was corroborated by her injuries, her contemporaneous statements to police officers immediately after the attack, those police officers' observations of the victim's injuries, and the testimony of the SART nurse who testified that the victim had injuries consistent with having been raped by Petitioner. *See id*. A. also provided separate, admissible testimony regarding Petitioner's propensity to commit domestic abuse, including striking and choking his victim. *See id*. In light of this probative and incriminating evidence, any error in admitting Summers's testimony did not have a "substantial and injurious effect" on the verdict. *See Dillard v. Roe*, 244 F.3d 758, 769–70 (9th Cir. 2001), *amended on denial of reh'g* (May 17, 2001) ("Even if we assume, without deciding, that the trial court [committed constitutional error], that ruling could not have had a 'substantial and injurious effect or influence in determining the jury's verdict.' . . . There was an abundance of other, uncontradicted evidence that Dillard had suffered the convictions alleged.") (citations omitted).

Accordingly, the Court finds that the admission of Summers's testimony did not render the trial unfair, and thus did not violate due process. Petitioner is not entitled to habeas relief on this claim.

### ii.      Claim that Evidence Was Excluded in Error (Claim 3)

Petitioner claims his constitutional right to present a defense was violated when the trial court did not permit Petitioner to introduce a restraining order that Petitioner had obtained against his ex-girlfriend, A. *See* Pet. at 53-55. Petitioner contends that the trial court's refusal to permit this evidence deprived Petitioner of his right to present a defense, and his right to a jury trial on all issues. *See id*. at 55. Petitioner argues that, had this restraining order been admitted into evidence, it would have bolstered his credibility, damaged A's credibility, and reinforced the defense theory that Petitioner's relationship with his victim was volatile. *See id*. at 54-55.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### a. State Court Opinion

The state appellate court described the factual background on this claim and rejected it as follows:

**The Trial Court's Refusal to Allow Defendant to Pull a Purported Restraining Order Against A. out of His Pocket, If Error, Was Harmless.**

The existence or nonexistence of a restraining order against A. by defendant came up several times at trial. A. testified she currently had a restraining order against defendant. She identified a document presented to her by the prosecutor as the restraining order application and attached order, and testified about its contents and the court hearing. The document itself was not admitted into evidence. A. also testified that defendant sought a restraining order against her at the same hearing. An objection was sustained to the prosecutor's question about how the court ruled on defendant's application. A. testified defendant did not *currently* have a restraining order against her.

On cross-examination, the prosecutor asked defendant if it was true the court had denied his application for a restraining order against A. He responded that he and A. had restraining orders against each other. During redirect examination, defense counsel asked defendant: "You also mentioned—and I'm going to ask the Court's permission—but you mentioned you have a restraining order in your pocket." Defendant responded that he did. Defense counsel then asked the court for permission to approach and get it from defendant. The court denied the request, stating, "I don't see that this is relevant, no." Counsel responded: "Okay, I'm sorry. [¶] So that was in regards to the restraining order you had against [A.]?" Defendant responded, "Correct," and the matter was dropped.

Defendant argues "[i]n refusing to permit the defense to present this evidence" on relevance grounds, the court abused its discretion and denied him his constitutional right to present a defense. We agree that the existence of a restraining order was relevant to support defendant's testimony that he had a restraining order against A., and *may* have undermined A.'s testimony that defendant *currently* did not have a restraining order against her. But the fact the court gave the wrong reason for its ruling does not necessarily mean it abused its discretion. (*Cape Concord Homeowners Assn. v. City of Escondido, supra,* 7 Cal.App.5th at p. 193.)

In the first place, defense counsel did not offer the piece of paper in defendant's pocket as *evidence*. Notably, the court sustained the defense hearsay objection to the admission into evidence of A.'s restraining order against defendant. There is no reason to believe the court would have ruled differently with regards to a restraining order obtained by defendant against A. Nor does defendant demonstrate that, despite his objection in the trial court, the court would have been wrong to exclude the piece of paper in defendant's pocket as inadmissible hearsay.

It is true that proof of the existence of such a restraining order would have supported the credibility of his testimony that he *did* have such

30

a restraining order, just as A.'s authentication of her restraining order against defendant supported her testimony that she had a restraining order against him. However, A.'s restraining order had been presented to her as an exhibit with which she could refresh her recollection and with which, presumably, defense counsel was already familiar. Allowing defendant to testify about the item in his pocket would have necessitated its review by defense counsel, who apparently was unaware of it, the prosecutor, and possibly the court, in the middle of defendant's testimony. A trial court has wide discretion to control proceedings in the courtroom, and we cannot say the court abused its discretion by cutting short a process which had the potential to degenerate into a "nitpicking war[ ] of attrition over [a] collateral credibility issue...." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296.) The court did not prevent defendant from presenting his own testimony that A. was abusive to him and that he had obtained a restraining order against her. His right to present a defense was not infringed by an ordinary state law evidentiary ruling. (*People v. Benavides*, *supra*, 35 Cal.4th at p. 91.) No error appears.

In any event, if the court did err, any error was harmless. The matter of whether defendant did or did not have a copy of a restraining order against A. in his pocket was entirely collateral to the main event. A. was not the complaining witness in this case. As discussed above in more detail with respect to the admission of Summers's testimony, the evidence that defendant committed the acts of which M. accused him was strong, supported as it was by M.'s testimony, the testimony of the police officers who assisted her, the SART nurse who examined her, and the totality of A.'s testimony. In our view, it is not reasonably probable the jury would have evaluated the sum total of the testimony differently if defendant had been permitted to show he had a restraining order against A. (*People v. Watson, supra*, 46 Cal.2d at p. 836.) . . . .

*Olive-Goffner*, 2017 WL 5494973, at *14–15.

### b.  Applicable Federal Law

A state court's procedural or evidentiary ruling may be subject to federal habeas review if it violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley*, 465 U.S. at 41; *Jammal*, 926 F.2d at 919-20; *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *cert. denied*, 478 U.S. 1021 (1986). A federal court can disturb on due process grounds a state court's procedural or evidentiary ruling only if the ruling was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters*, 45 F.3d at 1357; *Colley*, 784 F.2d at 990.

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

(internal quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding due process does not guarantee defendant right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *See Holmes*, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id*. at 325-26; *Egelhoff*, 518 U.S. at 42 (holding that exclusion of evidence does not violate due process unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."). But "at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial." *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness and was critical to defense violated right to present evidence).

In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)); *Drayden v. White*, 232 F.3d 704, 711 (9th Cir. 2000) (same). The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based. *See Chia*, 360 F.3d at 1006; *Miller*, 757 F.2d 988, 995 (9th Cir. 1985). The *Miller* balancing test, however, is a creation of circuit law and, consequently, is not "clearly established Federal law" for purposes of habeas corpus review under 28 U.S.C. § 2254(d)(1). *See Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009). Thus, because the Supreme Court has considered whether an evidentiary rule, by its own terms, violated a defendant's constitutional right to present evidence, but has not directly

1   considered whether a trial court's exercise of discretion to exclude evidence under a

2   constitutionally sound evidentiary rule violated a defendants' constitutional right to present

3   evidence, a state court's failure to apply the *Miller* balancing test is not contrary to or an

4   unreasonable application of clearly established Supreme Court precedent. *See id.* at 758-59.

5       Even if an evidentiary error is of constitutional dimension, the court must consider whether

6   the error was harmless under *Brecht. Dillard*, 244 F.3d at 767 n.7.

7                   **c.  Analysis**

8       In Claim 3, Petitioner argues that the trial court erred in excluding evidence that he had a

9   restraining order against A. Petitioner urges that, if admitted, this evidence would have bolstered

10  his credibility, damaged A.'s credibility, and illustrated Petitioner's defense that both participants

11  in a volatile relationship may be subjected to domestic violence. *See* Pet., Ex. A at 54-55.

12  Petitioner argues that, by excluding this evidence, the trial court deprived him of a defense and

13  right to a jury trial on all issues. *See id*. at 55.

14      First, to the extent Claim 3 alleges a violation of state law, such a claim fails because a

15  state evidentiary rule cannot be the basis for federal habeas relief. *See Estelle*, 502 U.S. at 67-68

16  (federal habeas unavailable for violations of state law or for alleged error in the interpretation or

17  application of state law). As such, Petitioner may not challenge the trial court's evidentiary ruling

18  on the grounds that it violated the state's evidence code. *See Jammal*, 926 F.2d at 919-20. Further,

19  the failure to comply with a state's rules of evidence is neither a necessary nor sufficient basis for

20  granting federal habeas relief, and the presence or absence of a state law violation is irrelevant. *Id.*;

21  *see also Estelle*, 502 U.S. at 67-68.

22      Even if Petitioner's claim were cognizable in federal habeas, the state appellate court

23  reasonably rejected it. As mentioned above, at trial, Petitioner sought to admit evidence that he

24  had a restraining order against A., thus contradicting A.'s testimony that Petitioner currently had

25  no restraining order against her. *Olive-Goffner*, 2017 WL 5494973, at *15. The state appellate

26  court found that, even if the trial court erred in excluding evidence of Petitioner's restraining order

27  against A., any such error was harmless. *See id*.

28

33

1       Applying the required standard of heightened deference in evaluating the state court

2    decision, the Court finds the state appellate court's rejection of this claim was not unreasonable.

3    Even if Claim 3 is considered under *Miller*'s balancing test, Petitioner's due process rights were

4    not violated by the exclusion of the restraining order. As mentioned above, Petitioner asserts that

5    the restraining order would have bolstered his, and diminished A.'s, credibility. Accordingly, the

6    Court considers the weight of this evidence on the issue of A.'s credibility in applying the *Miller*

7    balancing test. As to the first factor of this test, the probative value of the excluded evidence was

8    minimal because, as discussed *infra*, A.'s credibility was "entirely collateral," rather than a central

9    issue in Petitioner's trial. *Olive-Goffner*, 2017 WL 5494973, at *15  The Court assumes that the

10   second and third factors of the *Miller* test, reliability of the evidence and whether the evidence

11   could be evaluated by a trier of fact, operate in Petitioner's favor; the record reveals no reason to

12   suspect that the restraining order was unreliable, or that a jury would be unable to understand it.

13   However, the fourth *Miller* factor tilts against Petitioner, because a copy of the restraining order

14   was merely cumulative of Petitioner's testimony that he had such a restraining order. *See id*.

15   (petitioner was able to state three times before the jury that he had a restraining order against A.).

16   Finally, the fifth Miller factor also tilts against Petitioner, because the physical copy of his

17   restraining order against A. did not constitute a major part of Petitioner's attempted defense. The

18   defense theory of the case was that *the victim* was lying about Petitioner's physical and sexual

19   assault upon her. *See id*. at *6-8. Whether Petitioner had a restraining order against A. did not bear

20   upon *the victim's* credibility, only upon A.'s. Thus, the evidence at issue was, at best, "collateral."

21   *Id*. at *15. With only two of the five factors weighing in Petitioner's favor, it cannot be said that

22   the exclusion of the restraining order violated Petitioner's rights to a fair trial and to present a

23   defense under *Miller*. *Id*.

24       Moreover, the decision to exclude the restraining order was not so prejudicial that it

25   rendered the trial fundamentally unfair. As the state appellate court noted, strong evidence

26   supported Petitioner's guilt, including "[the victim's] testimony," "the testimony of the police

27   officers who assisted her, the SART nurse who examined her, and the totality of A.'s testimony."

28   *Id*. at *15. In addition, the Court notes that Summers's boyfriend "heard the sounds of struggling,

1   yelling, and crying. He heard [the victim] call out, '[H]elp me. Someone,' and bang on the door.

2   Defendant said, 'No one's going to help you.'" *Id*. at *3. This testimony provides further support

3   for the victim's version of events: the victim said she called out for help during the attack, and

4   Summers's boyfriend heard the victim do so. In light of this strong evidence that Petitioner

5   physically and sexually assaulted the victim, the decision to exclude the collateral evidence of a

6   restraining order against one witness was not prejudicial.

7       Based on the foregoing, the state appellate court's rejection of this claim was not an

8   unreasonable application of Supreme Court precedent or based on an unreasonable determination

9   of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not

10   entitled to habeas relief on this claim.

11          ### iii.    Cumulative Error (Claim 4)

12       In his final claim, Petitioner contends that the cumulative effect of the errors discussed in

13   Claims 1 through 3 violated his due process rights. *See* Pet. at 6; *see also* Pet., Ex. A at 57-58. The

14   state appellate court determined that there was no cumulative error, after rejecting the individual

15   claims of error. *Olive-Goffner*, 2017 WL 5494973, at *15. Even based on an independent review

16   of the record, Petitioner is not entitled to federal habeas relief on this claim.

17       The Ninth Circuit has held that in exceptional cases, although no single trial error is

18   sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may prejudice a

19   defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862,

20   893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered

21   defendant's efforts to challenge every important element of proof offered by prosecution).

22   Cumulative error is more likely to be found prejudicial if the government's case is weak. *See id.*

23       However, where there is no single constitutional error existing, nothing can accumulate to

24   the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if

25   there was "no error of constitutional magnitude occurred, no cumulative prejudice is possible").

26   Because Petitioner's Claims 1 through 3 fail, there is no single constitutional error that exists. *See*

27   *id.* Therefore, the California Court of Appeal reasonably rejected Petitioner's cumulative error

28   claim, and Petitioner is not entitled to relief under the cumulative error doctrine.

United States District Court
Northern District of California

1

### C.   Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### IV.   CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk of the Court shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  November 16, 2020

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

36